DETERMINED IN THE

# FIRST DEPARTMENT,

AT

# GENERAL TERM,

## December, 1878.

---

## THE PEOPLE'S BANK OF THE CITY OF NEW YORK, APPELLANT, v. ORLANDO M. BOGART AND OTHERS, RESPONDENTS.

*Sale of acceptances by note-brokers — what suppression of facts not fraudulent — when an implied warranty cannot be established by usage.*

On July 20, 1875, the defendants, note-brokers in New York, wrote to plaintiff that they had purchased $70,000 of the acceptances of Duncan, Sherman & Co., and offered them for sale. Plaintiff's president called the next day and purchased $15,000 of the acceptances, and on subsequent occasions $15,000 and $5,000 thereof. Defendants had purchased these acceptances of Duncan, Sherman & Co., and paid their own money for them. The acceptances were drafts drawn by one Burgess upon, and accepted by Duncan, Sherman & Co. Burgess was a clerk of the latter firm, and had no funds deposited with, or debt due from it, and had nothing to do with the drafts except to sign them. Similar acceptances had been bought before by plaintiff, which had been paid. A few days after the last purchase, Duncan, Sherman & Co. failed. Plaintiff claimed that defendants had knowledge of the circumstance attending the giving of the acceptances, and that they were liable to plaintiff for a fraudulent concealment of such facts.

*Held,* that the suppression of such facts was not fraudulent, and that the defendants were not liable. (DAVIS., P. J., dissenting.)

*Held,* further, that the acceptances being valid obligations, and no express warranty, having been made in regard to them, no implied warranty could be established by proof of any local usage or custom, as to what acceptances were understood to be, in the commercial community of New York.

Appeal from a judgement in favor of the defendants, entered upon an order dismissing the complaint.

*Luther R. Marsh* and *John C. Gray*, for the appellant. The law is well-settled that a holder of commercial paper, offering it for sale, is bound to disclose any knowledge he may have of any facts materially affecting and depreciating its value. (*Brown* v. *Montgomery*, 20 N. Y., 287; and, see, *Lancey* v. *Clark*, 64 id., 212; Kerr on Fraud, p. 94, 95; Addison on Torts, p. 399; *Clark* v. *Banner*, 2 Lansing, 67; 2 Kent, 483; *Rawdon* v. *Blatchford*, 1 Sandf. Ch., 344; *Allen* v. *Addington*, 7 Wend., 9, 23, 24; *Paddock* v. *Strowbridge*, 29 Vermont, 470; *Bench* v. *Sheldon*, 14 Barb., 73; *Mellish* v. *Motteux*, Peake's N. P. Cases, 115.) A party who offers a piece of paper for sale, which has all the form and appearance of a bill of exchange, thereby represents it to be a bill of exchange, to wit : a bill drawn by a drawer upon a drawee upon consignments, values, funds or credit, and accepted on such consideration ; and if the seller knows that it is not such a bill, but is a sham or deceit, and withholds that knowledge, or the facts which would warrant that belief from the purchaser, he suppresses a material fact which will make him liable to the purchaser to refund the amount of the purchase-money. (*Lancy* v. *Clark*, 64 N. Y., 212; 2 Parsons, B. & N. ch. 2, sec. I. and cases cited in note; Addis. on Contr., 232; *Azemar* v. *Casella*, L. R., 2 C. P., 678; 2 Blackstone, 466, 469, marg; 3 Kent, 745, marg.; *Hortsman* v. *Henshaw*, 14 How. [U. S.] R , 177–183; *Raborg* v. *Peyton*, 2 Wheat. [U. S.] R., 386; *Mechanics' Bank* v. *Livingstone*, 33 Barb., 458; 1 Parsons on Bills, 323; 2 Greenl., § 169; 1 Daniel on Negotiable Instruments, § 534; Story on Bills of Exchange, § 12; *Atlantic Ins. Co.* v. *Bores*, 6 Duer, 583; *Thurman* v. *VanBrunt*, 19 Barb., 409; *Vere* v. *Lewis*, 3 T. R., 182 [1789] ; 2 Greenl., § 160; *Roach* v. *Ostler*, 1 M. & R., 120; *Fairchild* v. *Ogdensburg R. R. Co. etc.*, 15 N. Y., 337; *Davis* v. *Clarke*, 6 Q. B., 19.)

*William Allen Butler*, for the respondents.

Brady, J. :

The object of this action was to recover from the defendants, who composed the copartnership of Orlando M. Bogart & Co.,

note-brokers and dealers in commercial paper in the city of New York, the sum of $34,455.83 damages for alleged fraud in the sale of certain acceptances by the copartnership firm of Duncan, Sherman & Co., a banking firm doing business in the city of New York, of drafts drawn on them by one Alexander Burgess. The complaint contains the necessary allegations to present fully the theory upon which the plaintiff's expected to succeed, and the answer controverted the material averments therein. The proofs upon the trial established the following facts, namely : that the plaintiff's were and have for many years been a bank of discount and deposit in the city of New York, and that the defendants were and had for many years been note-brokers in that city ; that Duncan, Sherman & Co. were at, and prior to the time of the purchase of the paper, bankers in said city, and had a commission business besides in merchandise, but particularly in cotton ; that the defendants had been in the habit for many years of buying and selling the paper of that firm ; that on the 20th of July, 1875, the plaintiff's received a letter from the defendants stating that they had purchased $70,000 of the acceptances of Duncan, Sherman & Co., at a certain price, and would sell them at a certain rate therein mentioned ; that Mr. Hunter, the plaintiff's president, in response to the letter, went to the office of the defendants on the same day and bought $15,000 of the acceptances, and went again on the twenty-first of July and bought $15,000 more, and on the next day went again and purchased $5,000 additional; that the plaintiff paid for each day's transaction on the day it was consummated, and at the rate of six per cent interest per annum discount for the time the paper had to run. It further appeared that the amount paid out was $34,455.83 ; it further appeared that the defendant had purchased all of the acceptances from Duncan, Sherman & Co., the acceptors, directly, $70,000 of the paper on the nineteenth of July, and $30,000 on the twenty-first of July. That the plaintiff's president, who made the purchase, and their vice-president had no knowledge as to the manner in which the paper was made and issued, nor did they know Alexander Burgess, whom they had never seen, but who appeared on the paper as the drawer. It was further shown that about a week after the purchase, Duncan,

Sherman & Co. failed, and also that subsequent to the purchase it was ascertained that Alexander Burgess, who appeared as the drawer, was a clerk in Duncan, Sherman & Co.'s office at a salary, having no separate business of his own and sustaining no business relations with his employers other than as such salaried clerk. That the paper was prepared by Duncan, Sherman & Co.'s cashier in the form of drafts on them which Burgess signed as drawer, and that Burgess knew nothing about the making and issuing of the paper, and had nothing whatever to do with it beyond signing it. It also appeared that the defendants had paid for the paper which they bought and sold to the plaintiffs, and that they were not acting in the transaction between them and the plaintiff in any way on behalf of the firm of Duncan, Sherman & Co., having bought the paper in the usual and ordinary course of business, and paid for it with their own money ; it also appeared that their business was large, and that they sold to merchants, capitalists and bankers, and were in the habit of sending notices to their customers to inform them what paper they had on hand for sale, and that they sent such a notice to the plaintiffs informing them that they had for sale Duncan, Sherman & Co.'s paper. It appeared also that the house of Duncan, Sherman & Co. was in high credit at the time of these purchases by the plaintiffs ; that their name was regarded as a first-class one in every respect ; that the plaintiffs had before that time frequently bought their acceptances with Burgess' name on them ; that such purchases were made from brokers other than the defendants, and that the paper had always been paid by Duncan, Sherman & Co. at its maturity, It also appeared that the insolvency of the latter firm was the sole reason for the non-payment of the paper. The transactions between the plaintiffs and the defendants, to which reference is thus made, were based upon the offers of the paper by the defendants for sale, no representations of any kind having been made by the defendants to induce the purchase, other than that which is claimed by the plaintiffs to have arisen from the use of the word " acceptances."

The plaintiffs sought by a series of questions to establish the fact that the defendants knew the relations existing between Alexander Burgess and Duncan, Sherman & Co., and were therefore well aware of the fact that the bills of exchange sold

by them to the plaintiffs were drawn by a clerk in the office of Duncan, Sherman & Co., and were to be sold for the benefit of the acceptors, and rested their right to recover upon the suppression of this as a material fact by the defendant, which if it had been revealed, as they assert, the paper would not have been purchased. The case discloses no other element of fraud, and therefore, if the action is to be regarded as one *ex delicto*, the question presented is whether such a suppression would constitute fraud or covin in the transactions by the defendants, which invalidated the contract and makes them liable to respond in damages. There is nothing in the case to show that the defendants had any reason to suspect the insolvency of Duncan, Sherman & Co., other than that they were selling acceptances, which might, perhaps, be regarded as an extraordinary circumstance. But there is little force in this suggestion, for the reason that similar acceptances had for some time been in the market, had been negotiated, and had been paid at maturity. Indeed, it appears that the defendants had great confidence in the validity of this paper, and in the solvency of Duncan, Sherman & Co., because they paid cash for the purchases made, and with their own money. This, as prudent men, they were justified in doing, because, as appears from the plaintiffs' case, the firm of Duncan, Sherman & Co. stood high in the commercial sense of the term, and their paper was regarded as first-class. It may be said in relation to the charge of fraud, that the plaintiffs undoubtedly relied chiefly upon the credit and responsibility of Duncan, Sherman & Co. in the purchase of the paper, and were not influenced in such purchase by any other circumstance than its being offered for sale. This is fully established by the fact that their president having made the first purchase returned voluntarily to the office of the defendants, on two subsequent occasions close to each other, for similar purchases, thus indicating an eagerness to get possession of it. It is quite apparent, therefore, that unless the mere suppression of the fact that Burgess was a clerk of Duncan, Sherman & Co., and was used by them for the purpose of creating bills of exchange in form was in itself fraudulent, the plaintiffs are remediless on that branch of the case.

The plaintiffs place great reliance upon the proposition that the

paper sold were not acceptances, because Alexander Burgess had neither funds in the banking-house of Duncan, Sherman & Co. nor property placed in their custody, nor a debt due to him from them, against which he could draw, and that they were in fact promissory notes. Assuming that as to the form of the paper this proposition was correct, it cannot aid the plaintiffs, for the reason that Duncan, Sherman & Co. and Alexander Burgess were liable to them on the paper, as innocent holders, and that it was valid as an existing liability, the payment of which could be enforced, if the drawer or acceptors, either or both, had the means to pay. We have not been referred to any case in which such a suppression as that complained of, affecting only the form of the paper and not its validity as a legal instrument, has been declared to be fraudulent, and we have sought in vain to find the enunciation of any such doctrine. In the sale of negotiable commercial paper, there is no implied warranty except first, that the paper is genuine and that the seller has a good title and right to transfer the instrument by delivery; second, that he has no knowledge of any fact which if proved would show the instrument, if originally valid, to be worthless, either by failure of the maker or by its being already paid, or from some other circumstance to have become void and discharged. (*Curtis* v. *Brooks*, 37 Barb., 476; *Bell* v. *Dagg*, 60 N. Y., 528.) Giving effect in the broadest possible manner to the facts shown by the plaintiffs and sought to be established by them, they would not demonstrate that any one of these implied warranties had been broken. The defendants had a good title and a right to transfer by delivery. The instruments were genuine; that is, they were not forged, and the parties were real parties who are liable upon them; and the defendants had no knowledge that the bills of exchange were worthless by the failure of the drawer or acceptors or by their having been paid, or in any other way discharged, whether in fact or by operation of law.

These views are all that we deem it necessary to express in relation to the asserted right of the plaintiff to recover upon the ground of fraudulent suppression. The plaintiffs, however, seem to have presented their case in two aspects: one upon the charge of fraud, which has been considered, and the other upon a con-

tract growing out of the custom or usage in reference to the sale of bills of exchange of the particular character of the paper in question. It has been held that where fraud is the basis of the complaint, a recovery cannot be had as for a breach of contract (*Ross* v. *Mather*, 51 N. Y., 108); but viewing the case as one in which a remedy might be had in the latter aspect, the plaintiffs are remediless because the acceptances in question being valid obligations, as they purported to be on their face, and no express warranty having been made in regard to them, no implied warranty can be grafted on the transactions in relation to them by evidence of any local usage or custom, as to what acceptances are understood to be, in the commercial community of New York. No custom in the sale of any particular description of goods can be deemed to control the general rules of law. (*Thompson* v. *Ashton*, 14 John., 316; *Beirne* v. *Dow*, 5 N. Y., 95; *Wheeler* v. *Newbould*, 16 N. Y., 392; *Haskins* v. *Warren*, 115 Mass., 514; *Commercial Bank* v. *Varnum*, 3 Lans., 90.) The exclusion of testimony in reference to the custom of note-brokers and purchasers, in regard to dealing in that class of paper, and what an acceptance was understood to be or to import, or what such dealers, when they are called upon to purchase that class of paper, understand that they are purchasing, and kindred matters, was correct, and the exception to the numerous questions put upon that subject are not available. If a consideration of all the authorities bearing upon the question here considered, and their application to the various relations created by drawer and acceptor, and by maker, payee and indorser of commercial paper, justified the conclusion that the defendants, by the offer and sale of the paper which they knew was not strictly in form and substance a bill of exchange, had by an implied warranty asserted the paper to be valid in form and substance — that is, a bill of exchange containing all the essential elements of such an instrument, viz., a drawer against a fund or property, or a debt, either in the possession of or due from the acceptor—there would be little hesitation in declaring that the plaintiffs were entitled to submit the questions to the consideration of the jury, and to let them determine whether the transactions between the plaintiffs and the defendants were marked by good faith on the part of the

latter ; but, as already suggested, the authorities lead to no such result.

Perhaps morally, inasmuch as the instruments would seem to have been departures from the ordinary mode of doing business, being innovations upon bills of exchange proper, the defendants, assuming them to have known the manner in which they were made, should have disclosed the fact, and left the plaintiffs to the option of a purchase or a declination to do so ; but the rules of law do not impose any such obligation. The only burdens assumed by vendors of commercial paper, according to the law of this State, have been considered and they do not include one such as that stated. It becomes our duty, therefore, notwithstanding the very able, elaborate and ingenious argument of the learned counsel, on behalf of the plaintiffs, to affirm the judgment appealed from.

Ingalls, J., concurred.

Davis, P. J., dissenting.

The instruments sold by defendants to plaintiff were not bills of exchange, or "acceptances," in the commercial sense of those terms, either in law or in fact. They were simulated bills and acceptances, having the form merely of such instruments, without the reality or substance. The evidence tended to show that these facts were known to the defendants and unknown to the plaintiffs. It ought, I think, to have been submitted to the jury to determine whether they were fraudulently concealed.

I think it is a fraud, for which the law affords redress, for a party having the possession of a negotiable instrument which bears on its face every appearance of the commercial paper which it purports to be, and having knowledge that it is in fact not such paper, but is simulated for the purposes of sale, to sell the same to another who purchases in good faith for full value, relying on such appearances and believing it to be what it purports, without disclosing to him its true character and giving him an opportunity to decide whether or not he will purchase with such knowledge.

Fair dealing and moral honesty require that *known* latent defects, which in themselves falsify the appearances written on the face of the instrument and change it from what its appearance imports, to

something intrinsically and materially different, should be disclosed to the buyer, or certainly should not be knowingly concealed.

I think the judgment should be reversed and a new trial granted, with costs to abide the event.

Judgment affirmed.